Filed 1/20/21  In re Jessica G. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re JESSICA G., a Person Coming Under the Juvenile Court Law. | |
| | D077882 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J520263) |
| v. | |
| JESUS R., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Browder A. Willis, III, Judge.  Affirmed.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel for Plaintiff and Respondent.

Jesus R. (Father) claims that insufficient evidence supports the juvenile court's jurisdictional finding (Welf. & Inst. Code, § 300, subd. (a))[1] and dispositional order regarding his infant daughter, Jessica G. Father argues that the court improperly relied on a rebuttable presumption under section 355.1, subdivision (a), as to the cause of Jessica's injuries and that he was not given notice and opportunity to present rebuttal evidence. We conclude that Father's argument lacks merit and that substantial evidence supports the court's finding and order.

FACTUAL AND PROCEDURAL BACKGROUND

On January 14, 2020,[2] two-month-old Jessica was injured while exclusively in her father's care. Jessica's mother (Mother) was at the laundromat when an incident occurred. According to Father, he put Jessica in her baby swing unstrapped, turned the swing on to its maximum speed (level six),[3] closed the door to his bedroom, and went to the kitchen. The swing sat approximately one and a half feet off the carpeted floor. About 20 minutes later, Father reportedly heard a loud cry from his bedroom, and upon entering his room, he found Jessica lying face down on the carpet. Father noticed that Jessica's face was injured. He said he was unsure whether she had hit the frame of his bed or the swing, and no one else was home.

---

[1]     Further unspecified statutory references are to the Welfare and Institutions Code.

[2]     Further unspecified date references occurred in 2020.

[3]     At trial, the juvenile court received Jessica's swing in evidence without objection. The court found that the "speed of six was very, very gentle and slow."

2

A few minutes later, Mother arrived home from the laundromat. Father told Mother that Jessica had fallen off the swing. The parents noticed bruising and inflammation on the left side of Jessica's face and redness in her left eye. They did not seek medical attention that day because they thought her condition might improve on its own.

The next day, because Jessica's condition had not improved, the parents brought her to a local clinic. The clinic advised them to take the infant to Rady Children's Hospital. At the hospital, Jessica was seen by Dr. Stephanie Schroter, the emergency room attending physician. In addition to facial bruising and an eye injury ("subconjunctival hemorrhage"), Dr. Schroter found a bruise on the infant's abdomen, all of which was reportedly caused by a single fall off the swing. Dr. Schroter consulted with Dr. Premi Suresh, who specializes in child abuse pediatrics. Dr. Suresh shared Dr. Schroter's concerns about the reported cause of Jessica's injuries, noting that "[a] subconjunctival hemorrhage and bruising in an infant would be considered 'sentinel injuries' and are highly predictive of future more serious injury. Therefore, these injuries, while seemingly small, must be taken very seriously as they are likely to indicate inflicted injury. In this case, it does not seem plausible that the baby would get injury to both the eye and abdomen from this fall."

Social workers and police officers became involved in Jessica's case. Upon questioning as to the cause of Jessica's injuries, Father told officers the story of the infant's falling off the swing. He told the same story to two different San Diego County Health and Human Services Agency (Agency) social workers.

The following day, Jessica was examined by Dr. Marilyn Kaufhold, an attending pediatric physician at Rady Children's Hospital. Dr. Kaufhold had

practiced pediatrics at the hospital since 1971 and was board certified in child abuse pediatrics.  Dr. Kaufhold's examination of Jessica lasted for over an hour.  The doctor spoke to the parents about Jessica's medical history and circumstances of the supposed fall, asked Father to use a stuffed animal to demonstrate the baby's position when he found her, took pictures of Jessica, conferred with a social worker and police detective, watched a video of the swing in motion, and prepared a report.

Dr. Kaufhold documented her medical examination and described the extent of Jessica's injuries, including a subconjunctival hemorrhage in the left eye, bruises on the left forehead and eyebrow area, a bruise on the left upper thigh,[4] and a bruise on the "left lower quadrant of the abdomen. . . . amorphous in shape with no particular pattern."  In her notes, Dr. Kaufhold wrote, "Per [Father], [Jessica] fell out of the same swing about a month ago as well but she was fine afterwards."

In Dr. Kaufhold's assessment, "Jessica has bruises on different areas and planes of her body that are unlikely to have been caused by the fall from the swing her father describes.  The subconjunctival eye hemorrhage is a type of bruise that in this case was probably caused by the direct trauma that resulted in the adjacent forehead/eyebrow bruise.  It is a finding that when present is often associated with inflicted trauma . . . . Although it can be seen in other conditions (infectious, oncologic, hematologic and severe valsalva), Jessica does not have any of these diagnoses.  Appropriate studies were done to rule them out in the emergency department[.]"

On January 24, the Agency filed a petition on behalf of Jessica, alleging she had suffered, or there was a substantial risk she would suffer, serious

---

4    Dr. Kaufhold initially noted that the mark on Jessica's left upper thigh was a "possible" bruise because it could have also been a vein.  The mark was later confirmed as a bruise when it disappeared, i.e., healed.

physical harm inflicted nonaccidentally.  (§ 300, subd. (a).)  The petition specifically alleged that Father had "subjected the child to serious physical harm, including but not limited to, this infant child was found to have a subconjunctival hemorrhage, facial bruising, and bruising on the abdomen. The child was in the father's exclusive care when the injuries occurred[,] and medical professionals have determined the child's injuries are not consistent with the father's explanation and are indicative of inflicted trauma, including but not limited to rough handling or forceful grabbing."

Thereafter, the Agency filed its detention report, containing the statements of each of Jessica's treating physicians at Rady Children's Hospital and attaching Dr. Kaufhold's examination report.  According to Dr. Kaufhold, Jessica's abdomen could not have been bruised by falling off the swing as Father described; bruising to the abdomen is usually caused by a "deep indenting blow."  Abdominal injuries can be life threatening.

At the detention hearing, the juvenile court appointed counsel for Father and detained Jessica with Mother on the condition that Father remain outside of the home.

On the date set for the jurisdictional and dispositional hearing in February, Father requested a trial set on the truth of the allegations. Jessica's counsel (minor's counsel) stated that she would not be joining Father's trial set, but she wished to cross-examine the "child abuse expert." This began a colloquy on the issue of expert testimony.  The Agency's counsel said that Dr. Kaufhold would be testifying and requested "that if the parents are going to retain an expert for their case, that [the] name of that individual, as well as any report they plan on authoring, be given by the [pretrial status conference], that way our expert has a chance to review it and be prepared for testimony so there [will] be no continuance."  The juvenile court agreed,

admonishing the parents that if they intended to provide "expert testimony to contest the Agency's expert, you must provide the curriculum vitae and reports at the time of the pretrial settlement conference. [¶] It's called reciprocal discovery. . . . It's very important that you discuss whether or not you're going to bring in your own experts or anything of that nature well ahead of time with the attorneys . . . ."

Meanwhile, Father was having supervised visits with Jessica, which progressively increased in quantity and length of time. He behaved appropriately during these visits. Father also participated in services. The contested jurisdictional and dispositional hearing was continued due to the COVID-19 global pandemic and ultimately reset for August.

At two pretrial status conferences, the issue of expert testimony was again discussed amongst the court and counsel. In June, Father's counsel reported that he was requesting a continuance so that Father's expert could review Jessica's medical records. The court found good cause to grant Father's request.

At the August pretrial status conference, Father disclosed the name of his expert witness—Dr. Stephen Carson. Likewise, the Agency confirmed Dr. Kaufhold as its expert witness. The court advised the parties of its practice to conduct a "402 hearing" in chambers directly before trial.

The contested jurisdictional and dispositional hearing proceeded as scheduled. The Agency's reports, which were received in evidence without objection, contained the assessments of Jessica's physicians that her injuries in January were inconsistent with Father's falling-off-the-swing story, and instead, were consistent with Father's inflicting a direct blow and/or roughly grabbing the infant while she was in his care. The Agency noted that the parents had maintained throughout the case that Jessica's injuries were

6

caused by her falling off the baby swing and had not at any time offered an alternative explanation.

The Agency called Dr. Kaufhold as a witness. The parties stipulated, and the court found, that she was an expert in pediatrics and child abuse pediatrics. Dr. Kaufhold affirmed her assessment and opinion that Jessica's injuries were not caused as Father maintained. The expert discussed the different mechanics of producing a bruise and the various bruises found on Jessica's body. Dr. Kaufhold explained how a fall from the swing, as Father described, was "not likely, at all" to cause the bruise to Jessica's abdomen. According to the doctor, "children fall from a variety of places and in a variety of ways, [but] they generally don't get bruises on their abdomen. And in this case, even given that supposedly she fell over this bar, the bar alone is not enough and can't produce enough of an indentation to produce that bruise on her lower abdomen."

Dr. Kaufhold further testified, "I think that [Jessica] was roughly handled because bruises are the result of trauma[,] and normal handling of an infant does not cause bruises[,] and to have so many bruises in different locations that can't be accounted for in a single event of a fall are my reasons for saying that this child was likely subjected to inflicted injury."

Father's expert, Dr. Carson, testified next. The doctor's three-page "child abuse consultation report" was admitted in evidence. The parties further stipulated, and the court found, that Dr. Carson was an expert in pediatric medicine. He testified to his belief that Jessica's injuries occurred from her accidentally falling out of the swing because "the bruising was even throughout all the pictures that I observed" on the left side of Jessica's body and there was no bruising on her right side. He also opined that the "vast majority" of subconjunctival hemorrhages he had seen in practice were

7

"accidental in origin." Dr. Carson acknowledged he had never spoken to Father, had not seen his reenactment of the supposed fall, and had not examined Jessica in person.

After Dr. Carson's testimony, the Agency recalled Dr. Kaufhold back to the witness stand for rebuttal. As to the issue of bruising on the left side of Jessica's body, Dr. Kaufhold pointed out that there was different "tissue" underneath the areas where Jessica was bruised, and it was "unlikely that the same force used to produce one of the bruises would produce all of the bruises." Furthermore, the bruises "[were] not perfectly lined up." Jessica's face alone was bruised on different planes and could not have been hit by the same bar on the swing. Dr. Kaufhold noted that Jessica had not exhibited signs of a bruising or bleeding medical condition, to date. Finally, even though subconjunctival hemorrhages can occur accidentally, such as from a pressurized sneeze or cough, if that had been the case for Jessica, she would not have also been accidentally bruised in the eye area. Based on the constellation of symptoms, Dr. Kaufhold opined that Jessica was not accidentally injured. In the doctor's view, Jessica's case was not a "close call."

At Father's request, the juvenile court admitted Jessica's baby swing in evidence without objection. The court's later ruling reflects that the court "plugged in the swing and watched it swing at the [maximum] speed and noted that the speed was surprisingly very slow. In my mind, I wanted to know what that sixth speed was because it seemed like it would be an incredible inertia and I was quite surprised that that speed of six was very, very gentle and slow."

The Agency and minor's counsel urged the court to make a true finding on the petition's allegations and order Father to remain outside the home for the time being. The Agency supported the initiation of unsupervised visits

8

and recommended as a reasonable dispositional measure that the Agency be given discretion to allow Father to return to the family home, with concurrence of minor's counsel.

After considering the evidence and arguments of counsel, the court made a true finding on the petition, discussing at length why it found that Jessica's injuries were "not accidental." The court summarized the evidence it had considered, including the medical findings from various physicians at Rady Children's Hospital, Dr. Kaufhold's opinion, the swing, the infant's age and abilities in January, Father's statements contained in Agency reports, and Dr. Carson's opinion.

With reference to Dr. Kaufhold's testimony, the juvenile court stated: "The court understands, and notes for the record, that when the court accepts . . . a medical doctor as an expert, the court must look to determine whether or not the expert testimony is credible and meets a standard that would assist the trier of fact. I found that this doctor's qualifications of longstanding pediatric practitioner with a special board certification in . . . pediatric abuse, was persuasive and telling[,] and when an expert's medical testimony that an injury is or was inconsistent with an accident then that burden, that shifts the burden to the parents to prove specifically that it was an accident. [¶] So, the court looked at the detention report and the jurisdiction report, which is in evidence, to determine . . . exactly what the father's position was as it relates to the injury. . . ."

The juvenile court then recounted Father's story regarding Jessica's falling off the swing and how "very, very gentle and slow" the court found the swing's movements. The court also stated that it had considered various points raised by Dr. Carson and weighed Dr. Carson's opinion against Dr. Kaufhold's opinion. In the end, the court was persuaded, by clear and

9

convincing evidence, that Jessica was a dependent child under section 300, subdivision (a).

Regarding disposition, the court allowed additional comments from all counsel and ultimately, accepted the Agency's recommendations. The court found that placing Jessica with Father would be detrimental for the same reasons that it had assumed jurisdiction. Jessica was placed with Mother. Further, the court granted the Agency discretion to allow the Father back in the family home, if a safety plan was in place and minor's counsel concurred.[5]

Father's appeal followed.

## DISCUSSION

I. *Substantial Evidence Supports the Court's Jurisdictional Finding*

A. *Standard of Review*

In reviewing the sufficiency of the evidence on appeal, we look to the entire record for substantial evidence to support the findings of the juvenile court. We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence, or determine where the weight of the evidence lies. Rather, we draw all reasonable inferences in support of the findings, view the record in the light most favorable to the juvenile court's order and affirm the order even if there is other evidence supporting a contrary finding. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53; *In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.) We conduct our substantial evidence review bearing in mind the required standard of proof. (*T.J. v. Superior Court* (2018) 21

---

5     Father's counsel conceded that Father had likely been negligent by Father's own statements. Father told Dr. Kaufhold that there had been a prior incident where infant Jessica fell out of her swing and then, according to Father, Jessica purportedly fell out again in January. Counsel argued, however, that Jessica was a dependent child under section "300(b)," not section 300, subdivision (a).

Cal.App.5th 1229, 1239.) The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the order. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

Further, we review the juvenile court's ruling, not its rationale. We affirm the court's order if supported by substantial evidence regardless of the trial court's stated reasoning. (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 876.)

B.    *Section 355.1 and the Parties' Contentions*

Section 355.1 provides that "[w]here the court finds, based upon competent professional evidence, that an injury, injuries, or detrimental condition sustained by a minor is of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, the guardian, or other person who has the care or custody of the minor, that finding shall be prima facie evidence that the minor is a person described by subdivision (a), (b), or (d) of Section 300." (§ 355.1, subd. (a); *In re A.S.* (2011) 202 Cal.App.4th 237, 243, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7 (*A.S.*).)

Section 355.1, subdivision (a), raises a rebuttable presumption affecting the production of evidence. (§ 355.1, subd. (c).) "The effect of a presumption affecting the burden of producing evidence is to require the trier of fact to assume the existence of the presumed fact unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption." (Evid. Code, § 604; *In re James B.* (1985) 166 Cal.App.3d 934, 937 (*James B.*) [discussing section 355.2, section 355.1's predecessor].) Section 355.1,

11

subdivision (a), "shifts to the parents the obligation of raising an issue *as to the actual cause of the injury* or the fitness of the home." (*James B., supra*, at p. 937, fn. 2, italics added.) If the parents raise rebuttal evidence, the Agency maintains the burden of proving the jurisdictional facts. (*Ibid.*)

Father contends the juvenile court relied on section 355.1, subdivision (a), at the jurisdictional hearing, but he did not have notice and an opportunity to present "rebuttal evidence," i.e., to contradict the presumed fact that Jessica was nonaccidentally injured. According to Father, the court shifted the burden to him to establish an accidental cause of Jessica's injuries. Finally, Father asserts that insufficient evidence supports the court's jurisdictional finding.

The Agency responds that it did not plead or rely upon the burden shifting presumption (§ 355.1, subd. (a)), to establish that Jessica was a child described by section 300, subdivision (a). Moreover, even if the juvenile court implicitly relied on section 355.1, subdivision (a), the Agency argues that Father clearly had the opportunity to, and did, produce "rebuttal evidence" as to the cause of Jessica's injuries. The Agency lastly contends that it met its burden of proof regarding the jurisdictional facts.

C.    *Analysis*

Based on our review of the record, the Agency correctly posits that it did not plead or intend to rely on section 355.1, subdivision (a), to establish the jurisdictional facts. (*A.S., supra,* 202 Cal.App.4th at p. 243.) "Section 355.1" is not referenced anywhere in the petition or in any submissions to the court. Further, the petition does not include the applicable language of section 355.1, subdivision (a). (*In re D.P.* (2014) 225 Cal.App.4th 898, 904 (*D.P.*).) The Agency did not request, and the court did not explicitly make, a prima facie finding that Jessica's injuries "would ordinarily not be sustained"

12

except for abuse or neglect, to trigger the section's applicability. (§ 355.1, subd. (a); *James B., supra*, 166 Cal.App.3d at p. 937.) The section was inapplicable, and the Agency was not required to give notice of it.

Father's argument that the court applied the presumption sua sponte hinges on certain remarks the court made as it rendered its ruling, about the burden shifting "to the parents to prove specifically that it was an accident." It is unclear what the court meant by this comment. The court did not expressly reference section 355.1. Even if the court implicitly applied section 355.1, that section merely raises a rebuttable presumption affecting the production of evidence. The section 355.1 presumption " 'disappears' " upon the introduction of evidence which would support a finding of its nonexistence, and the juvenile court must then weigh the inferences arising from conflicting evidence and resolve the conflict. (*D.P., supra*, 225 Cal.App.4th at pp. 904-905.) That is what the juvenile court did here.

Father was aware early on in this case that the Agency intended to call Dr. Kaufhold as an expert witness; counsel repeatedly conferred on the matter of expert testimony. The crux of Dr. Kaufhold's testimony—that Jessica's injuries were not accidental but the result of intentionally inflicted trauma—could be discerned from the Agency's filed reports. Father, in turn, offered the testimony of Dr. Carson, "raising an issue as to the actual cause of [Jessica's] injury. . . ." (*James B., supra*, at p. 937, fn. 2.) Dr. Carson explained why he believed Jessica accidentally fell out of the swing. The juvenile court considered and weighed all the evidence presented and found that the "injuries were not accidental." The court held the Agency to the clear and convincing standard of proof. Thus, even if the court implicitly applied the rebuttable presumption under section 355.1, there is no reversible error.

Moreover, substantial evidence supports the juvenile court's jurisdictional finding. The Agency was required to prove that Jessica "has suffered, or there is a substantial risk that [she] will suffer, serious physical harm inflicted non-accidentally . . . by [Father]." (§ 300, subd. (a).) The court found Dr. Kaufhold's opinion to be more credible than Dr. Carson's. Dr. Kaufhold's testimony, supported by the assessments of other physicians at Rady Children's Hospital, was that Jessica's injuries were not caused by an accidental fall off the swing. Two-month-old Jessica was unable to turn herself over; she was essentially immobile. The swing moved very slowly. The record supports that Jessica simply could not propel herself out of the swing with enough force to bruise several different locations on her body. It is reasonable to infer from the record that Father intentionally applied enough force to Jessica's face to cause bruising and an eye hemorrhage and applied an even greater amount of force to her abdomen, causing it to bruise. Although Jessica's injuries healed relatively quickly, a "court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re N.M.* (2011) 197 Cal.App.4th 159, 165.) The court did not err in assuming jurisdiction.

Father asserts that there was no longer a risk of harm to Jessica by the time of the contested hearing due to his progress in services. We disagree. The record does not disclose what triggered Father's abusive conduct in January, and he continuously maintained that Jessica fell off the swing. Father's inability to acknowledge the abuse, plus his unclear motivations, presented a continuing risk of harm to Jessica because she was still a baby. Out of Father's custody, she suffered no injuries, accidental or otherwise. We note that the physicians at Rady Children's Hospital were highly concerned about Jessica's constellation of injuries; Dr. Kaufhold indicated that

14

intentionally inflicted trauma to the abdomen could be life threatening.  We are persuaded the juvenile court could reasonably conclude that Jessica was at substantial risk of serious physical harm at the time of the hearing.

II.      *Substantial Evidence Supports the Court's Dispositional Order*

Father contends that substantial evidence does not support the dispositional order entered by the court, which placed Jessica with Mother, precluded Father from returning home based on a finding of detriment, and granted the Agency discretion to allow Father to return home with concurrence of minor's counsel.  Father argues there was a reasonable alternative to removing Jessica from his custody.

Before the court may order a child physically removed from his or her parent, it must find, by clear and convincing evidence, that the child would be at substantial risk of harm if returned home and that there are no reasonable means by which the child can be protected without removal.  (§ 361, subd. (c)(1); *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.)  "The parent need not be dangerous and the child need not have been actually harmed for removal to be appropriate.  The focus of the statute is on averting harm to the child.  [Citations.]  In this regard, the court may consider the parent's past conduct as well as present circumstances." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.)

"The court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion." (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006.)  We review a dispositional detriment finding for substantial evidence, bearing in mind the heightened standard of proof.  (*In re Liam L.* (2015) 240 Cal.App.4th 1068, 1087; *In re John M.* (2006) 141 Cal.App.4th 1564, 1569-1570.)

15

We find no error in the juvenile court's dispositional order. As noted in section I., *ante*, substantial evidence supports that Jessica was at substantial risk of physical harm inflicted by Father. A reasonable alternative to removing Jessica from both her parents' physical custody was placing Jessica with Mother on the condition that Father stay out of the home. (*In re Michael S.* (2016) 3 Cal.App.5th 977, 985.) Father insists that he should have been allowed to immediately return home, perhaps under stringent conditions. At trial, the juvenile court thoroughly considered this alternative, as well as others, and rejected the option of Father's returning home immediately. Unlike certain cases involving excessive discipline where a parent admits his or her triggering conduct (e.g., *In re A.F.* (2014) 228 Cal.App.4th 820, 822 [spanking with a belt to discipline misbehaving child]), it is unknown in this case what triggered Father's abusive conduct, he did not acknowledge being abusive, and both parents continued to deny that any abuse occurred. The court was aware of Father's progress in services and his appropriate behavior during supervised visits but believed it necessary for Jessica's safety that Father begin a period of unsupervised visits, and that all parties agree on a safety plan, before Father could move back in the family home. The court's dispositional order was reasonable.

DISPOSITION

The juvenile court's order is affirmed.

HALLER, Acting P. J.

WE CONCUR:

AARON, J.

GUERRERO, J.